**357 P.2d 144**

In the Matter of Roy Lee DODD, Petitioner,

v.

L. C. "Cal" BOIES, Sheriff of Maricopa County, Arizona, Respondent.

No. 7178.

Supreme Court of Arizona.

Nov. 13, 1960.

Gibson & Gibson, Phoenix, for petitioner.

Charles C. Stidham, County Atty., Phoenix, Darrell F. Smith, Deputy County Atty., Mesa, for respondent.

BERNSTEIN, Justice.

This is an original petition for a writ of habeas corpus to obtain the release of petitioner from the Maricopa County jail, where he is being held, without bail, for trial.

The principal issue before the Court is whether the evidence adduced at the preliminary hearing justified the magistrate in concluding there was "probable cause" that petitioner was guilty of the offense with which he was charged. Under our statutes, 17 A.R.S. Rules of Criminal Procedure, Rule 33, and § 13–2012, the magistrate shall hold a defendant for trial if he has no jurisdiction, and if he concludes upon preliminary hearing there is probable cause that defendant is guilty of the offense charged. He is also required to discharge defendant if he finds such probable cause does not exist. This Court recently stated, in discussing the function of the magistrate, that:

> " * * * a magistrate conducting a preliminary hearing should be mindful that his duty is not to determine the ultimate guilt or innocence of a defendant, or determine the degree of the crime charged, but only to determine whether there is probable cause to believe defendant guilty of the offense charged, and leave to the trial tribunal the final determination of the application of the law to the facts and leave to the jury the question as to whether defendant is guilty of the offense charged or of an included offense." Application of Williams, 85 Ariz. 109, 117–118, 333 P.2d 280, 285–286.

The record discloses that about 1:30 A.M. on the morning of June 11, 1960, petitioner approached Jesse Williams and asked him for a gun. Williams told petitioner that he did not have a gun, but that Leonard Phillips had one. Petitioner then asked Williams to get the gun from Phillips and shortly thereafter, Phillips returned with a gun which he gave to the codefendant, Melvin Dixon. Thereupon the petitioner, Williams, Phillips, and Dixon went beside the fire house where Dixon test-fired the gun. After the gun was test-fired, the group walked over to the Oasis Cafe. Williams testified that a short time later, while he was talking with his cousin in front of the Broadway Cafe, he heard a shot, and as he ran, he saw upon looking into the Broadway Cafe, the victim clutching a chair, the codefendant Melvin Dixon standing up, and petitioner sitting down in a booth.

Petitioner is here charged with first-degree murder under A.R.S. § 13–451, § 13–452, and § 13–453. The State concedes petitioner did not do the actual killing. It is the State's position, however, that petitioner "aided and abetted" codefendant, thus rendering himself a "principal" to the crime within the meaning of A.R.S. § 13–139, which provides:

"All persons concerned in the commission of a crime whether it is a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission * * * are principals in any crime so committed."

There is a serious question as to whether the magistrate was justified in deciding there existed probable cause that petitioner aided and abetted, especially in view of this Court's statement as to what acts are necessary to render one a principal.

"The 'aiding' or 'abetting' contemplated by the statute is some positive act in aid of the commission of the offense—a force physical or moral joined with that of the perpetrator in producing it. The aider or abettor must stand in the same relation to the crime as the criminal, approach it from the same angle, touch it at the same point. * *" State v. Martin, 74 Ariz. 145, 151, 245 P.2d 411, 414 citing for the quoted proposition Baumgartner v. State, 20 Ariz. 157, 178 P. 30.

Our cases and statute make it clear that in order to be guilty as a principal, one must possess criminal intent. A.R.S. § 13–131; Acker v. State, 26 Ariz. 372, 379, 226 P. 199, 201.

The crux of the problem depends upon what is meant by the phrase "probable cause". It has been held in order for a magistrate properly to conclude there is "probable cause" defendant committed the

offense for which he is charged, there must be " * * * more evidence for, (rather) than against", defendant's guilt, Davis v. Superior Court, 175 Cal.App.2d 8, 22–23, 345 P.2d 513, 522, and there must exist "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a *strong* suspicion of the guilt of the accused." Davis v. Superior Court, supra (emphasis supplied); People v. Nagle, 25 Cal.2d 216, 222, 153 P.2d 344, 347. Thus, although the State need not, at a preliminary hearing, present as much proof as would be required to sustain a conviction (People v. Nagle, supra), it must do more than create a mere suspicion that defendant is guilty of the offense for which he is charged.

The only evidence to link petitioner with codefendant Dixon is the testimony indicating at about 1:30 A.M. he (petitioner) told the witness Williams, Dixon "would give me $2 for the gun"; that he was present, along with Williams and Leonard Phillips, when Dixon test-fired the gun behind the fire station, and he was seen at about 2:00 A.M., immediately after the shooting, sitting down in a booth in the Broadway Cafe. There is no evidence showing petitioner had been with codefendant Dixon prior to petitioner's conversation with the witness Williams, nor is there any evidence demonstrating petitioner accompanied Dixon when the latter entered the Broadway Cafe with gun in hand. Most significant, there is no direct evidence to indicate petitioner was aware of the purpose for which Dixon later used the gun, if such a purpose even existed at the time the request was made.

The basis, therefore, for concluding there is "probable cause" petitioner aided and abetted codefendant Dixon in the murder of Stewart, rests squarely on the inferences that, at the moment petitioner told Williams to get a gun for Dixon who would pay $2 for it, he was fully aware of and acting in concert with Dixon's criminal intent, and that Dixon harbored such an intent at the time petitioner approached Williams.

It is well established "purely speculative inferences or conclusions do not constitute substantial evidence", Lemons v. Holland, 205 Or. 163, 199, 284 P.2d 1041, 286 P.2d 656, 657, and "an inference cannot * * * stand in the face * * * of another inference equally reasonable." Commercial Standard Ins. Co. v. Gordon's Transports, 6 Cir., 154 F.2d 390, 394; Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640, 645; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339–340, 53 S.Ct. 391, 77 L.Ed. 819; Burdick v. Bongard, 256 Minn. 24, 28, 96 N.W.2d 868, 872. It appears to us the evidence adduced at the preliminary hearing is susceptible of a multitude of inferences, equally as reasonable as the one drawn by the magistrate below, and the choice of the inference drawn by him must have depended upon speculation. For

example, we think it reasonable to infer petitioner was unaware of Dixon's plan (if such existed) when the former asked Williams to get a gun, and petitioner was getting the gun for Dixon because the latter was in fear of Stewart, the eventual victim; or petitioner was getting the gun to protect himself in what is admittedly a rough district. The character of the neighborhood in which the events occurred render several inferences plausible which might not, in a different locale, be at all sound.

Where the evidence is as wholly inconclusive as we see it, it is impossible for us, in good conscience, to agree the magistrate was justified in concluding there existed "probable cause" to believe that petitioner was guilty of the offense for which he was charged. It does not appear that, at the preliminary hearing, there was more evidence for, rather than against, petitioner's guilt, or that the facts could lead a man of ordinary caution to conscientiously entertain a *strong* suspicion of Dodd's guilt.

Writ granted.

STRUCKMEYER, C. J., and LESHER, J., concur.

PHELPS, Justice (dissenting).

The granting of a writ of habeas corpus in this case is so thoroughly unsupported by any evidence that I feel constrained to dissent. The statement of facts in the majority opinion is so at variance with the evidence that it makes it necessary for me to state the facts as adduced at the preliminary hearing. For instance, there is no evidence that the place where the killing occurred "is admittedly a rough district," as stated in the majority opinion. It is from this alleged statement of fact that the majority assert that a multitude of inferences may be drawn equally as reasonable as the one drawn by the magistrate which they say, in effect, was based upon speculation.

The majority draw from this incorrect premise the inference that:

"* * * it (is) reasonable to infer petitioner was unaware of Dixon's plan (if such existed) when the former asked Williams to get a gun, and petitioner was getting the gun for Dixon because the latter was in fear of Stewart, the eventual victim; or that petitioner was getting the gun to protect himself in what is admittedly a rough district. The character of the neighborhood in which the events occurred render several inferences plausible which might not, in a different locale, be at all sound."

The testimony of Williams clearly indicates that Dodd went across the street to the fire station and was present when the

gun was test-fired and then they all went back across the street. The evidence further shows that Dodd was seated in a booth in the Broadway Cafe where and when the shooting occurred. The evidence further showed that Dixon asked Dodd to procure a gun for him. There is nothing to indicate that Dodd and Dixon had not been together during that entire evening except circumstances which appear to me to indicate otherwise.

The facts are that petitioner and one Melvin Dixon were charged by complaint filed in the West Phoenix Justice Court with the crime of murder. The facts adduced at the preliminary hearing held July 5 were that:

On the 11th day of June 1960 at about 1:30 o'clock in the morning petitioner Dodd approached Jesse Williams, aged 17, and asked him if he had a gun. He replied he did not and added that Leonard Phillips had one. Dodd then asked Williams to go home and get the gun, stating that Melvin (Dixon) said he would give him $2 for it. This incident occurred outside the Oasis Cafe located on Broadway. Williams testified he asked Phillips (about the gun) and Phillips went home and got it—a 32 caliber pistol—and brought it back, and that it did not take him (Phillips) long to get the gun. He further testified that they then went across the street beside or back of the fire station and he gave the gun to Melvin Dixon. Melvin asked Phillips if it would shoot. Phillips replied that it was supposed to shoot. The gun was then tested by firing it. The empty cartridge was extracted and a new one put in. This is a significant fact as well as the test-firing. Dodd was present. However, the evidence is as silent as the voice of the deceased of any effort on the part of Dodd to prevent its use but it does proclaim in a language clarion-tongued that Dodd procured a grandstand seat in a booth in the restaurant to witness the cowardly kill. They then all went back across the street after they shot the gun. Williams said that after talking to some friends outside the Oasis he left and went across the street and stopped in front of the Broadway Cafe to talk to his cousin. He stated that he heard a shot and ran with everybody else and then stopped and turned around and looked in the window of the Broadway Cafe and saw deceased bleeding at the mouth as he stood behind a chair. He stated he saw both Dixon and Dodd in there. At the time he looked, Dodd was sitting down in a booth. Williams *stated he did not have any conversation with either Dixon or Dodd out behind the fire station when the test-firing was made*; that they were only out there three or four minutes and then all went back across the street together. Another witness by the name of Nelly Lucille Young testified that she was sitting in the Broad-

way Cafe at approximately 2 a. m. waiting for the food she had ordered when Melvin Dixon came in with a pistol in his hand. She further testified that:

"* * * He went—he got to the third table and he told Lonnie B. (Stewart) he said 'I will get you'. And then he pulled the trigger, and Lonnie B. stood up and picked up the chair. And he backed up twice and then he dropped the chair * * *."

Lonnie B. Stewart died as a result of a bullet fired by the codefendant of petitioner.

Upon the above testimony the magistrate ordered the petitioner and Dixon bound over for trial before the superior court on a murder charge. A writ of Habeas Corpus was applied for before the Honorable Henry S. Stevens, Judge of the Superior Court, and after hearing and taking the matter under advisement found that there was sufficient evidence to sustain the order of the committing magistrate and quashed the writ.

17 A.R.S. Rules of Criminal Procedure, rule 33 provides that:

"If it appears that any offense which the magistrate has no jurisdiction to try and determine has been committed and there is probable cause to believe the defendant guilty of the offense charged, the magistrate *shall* hold him to answer." (Emphasis ours.)

"Probable cause" has apparently not been defined by this Court but the California Appellate Court defined it as follows:

" 'Probable cause' is a state of facts which inclines a man of ordinary prudence conscientiously to entertain a *strong suspicion* that a prisoner is guilty." See People v. Wisecarver, 67 Cal. App.2d 203, 153 P.2d 778, 781; Woolard v. Ferrell, 26 Tenn.App. 197, 169 S.W.2d 134. (Emphasis ours.)

I believe the above definition is as nearly accurate as any that can be found.

A.R.S. § 13–139 provides that:

"All persons concerned in the commission of a crime whether it is a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission * * * are principals in any crime so committed."

Analyzing the above testimony the fact is inescapable and the conclusion is to me irresistible that Melvin Dixon and Lonnie B. Stewart had been engaged that evening in a serious quarrel or combat and that the bitter feeling of Dixon against Stewart continued to rage within him undiminished. That is exactly why he had Dodd procure the gun and it continued to rage undimin-

ished within him until he shot and killed Stewart. Otherwise, he would not have walked into the Broadway Cafe finding Stewart seated at the counter and stated without any word or act from Stewart "I will get you" and then pull the trigger firing two shots one or both of which caused Stewart's death.

Now what was petitioner Dodd's connection with the shooting and killing of Stewart by Dixon? It was simply that Dodd procured the gun from Phillips with which Dixon killed Stewart. The further fact is crystal clear that in procuring the gun from Phillips through young Williams that Dodd was then and there acting as the agent of Dixon. The gun was solicited and procured for his use and benefit. He told Williams that Dixon would give him $2 for the gun. What did Dixon want with the gun? The answer is, he wanted to do just exactly what he did do with it, i. e., to shoot and kill Stewart.

Is it possible that anyone can believe that when Dixon asked Dodd to get him a pistol at 2 o'clock in the morning that Dodd did not ask him what he wanted it for *if he did not already know?* These questions must be answered in the light of ordinary human conduct and every day experience. Would not such a request at 2 o'clock in the morning and under the circumstances have created at least a curiosity in the mind of Dodd

to know the purpose of its purchase and to inquire what urgency had arisen to require its use before the stores carrying such merchandise opened? Certainly it would and the fact that he did not inquire, *if he did not,* would create, in my opinion, an unrebuttable inference that Dodd knew full well the purpose for which it was wanted. So far as the evidence disclosed there were only a few people assembled there at that hour. It is inconceivable to me to believe or even surmise under such circumstances that Dodd did not know of the previous difficulty between Dixon and deceased or that he did not know the purpose for which Dixon wanted a gun at that hour in the morning. Even a "moron" would have made inquiry as to the purpose for which it was wanted if he did not know. If Dodd had not procured the gun and had it delivered to Dixon, Stewart would no doubt be alive today. Tempers would probably have cooled and a life have been saved.

Again reverting to the inferences upon which the majority base their opinion, we assert that they are wholly invalid. The majority in its opinion attemtps to justify the action of Dodd by stating that in the multitude of inferences that can be drawn it is reasonable to believe that Dixon may have wanted the gun because he was in fear of the deceased. By relying upon this in-

ference the majority is, in effect, abrogating the established rule of law pertaining to self-defense. This inference that the majority claims can justify the action is an open invitation to would-be killers to carry firearms into "rough districts" to defend themselves or to procure a firearm because of a fear that has arisen after arriving there and then use the opinion of the majority to justify their acts if they use a gun on an unarmed person. This is certainly a dangerous precedent to set and is one that will in all probability come back to haunt this Court.

I thoroughly agree with the magistrate and with Judge Stevens that the evidence *adduced was ample to find probable* cause to "entertain a strong suspicion" that petitioner aided and abetted in the commission of the murder of Stewart by defendant Dixon, and I believe the action of the majority members of the Court, if followed, will impede the administration of justice often in the future. Magistrates are entitled to construe the action of the majority as a license to find or refuse to find "probable cause" with impunity regardless of the character of the evidence, and the prosecuting attorney will be slow to refile a complaint under such circumstances. The writ should have been denied.

UDALL, J., concurs in this dissent.